UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

TECHE VERMILION SUGAR CANE
GROWERS ASSOCIATION INC., ET AL.

VERSUS

JULIE SU, ET AL.

CASE NO. 6:23-CV-831

JUDGE ROBERT R. SUMMERHAYS

MAG. JUDGE CAROL B. WHITEHURST

## MEMORANDUM RULING

The present matters before the Court are Plaintiffs' Application for a Preliminary Injunction [ECF No. 3], Defendants' Partial Motion to Dismiss [ECF No. 32], and Defendants' Motion to Dismiss the Amended Complaint [ECF No. 37]. All three motions are opposed,[1] and the parties filed replies.[2]

## I.
### BACKGROUND

This case involves a challenge to a United States Department of Labor (the "DOL") regulation that effectively increases the wage rates that Louisiana sugarcane growers must pay foreign workers admitted to the country under H-2A agricultural worker visas and whose duties include hauling sugarcane using heavy or tractor-trailer trucks. The regulation increases the wage rates applicable to these workers in Louisiana from approximately $13 an hour to approximately $25 an hour. Plaintiffs assert that the DOL's regulatory change impermissibly requires agricultural employers to pay some H-2A agricultural workers wages that are based on the higher average wage rates for "non-farm" domestic workers who are not "similarly employed."

Plaintiffs are four sugar cane farm operators who employ or plan to employ temporary foreign workers to perform agricultural work through the H-2A program and three organizations

---

[1] ECF Nos. 21, 34, 41.
[2] ECF Nos. 28, 36, 42.

that represent or advocate for agricultural businesses.[3] Some of the H-2A workers employed by the Plaintiff growers are required to haul sugarcane from field to mill using heavy trucks as one of their tasks on the farm. Defendants are the Secretary of the DOL and other DOL officers and employees.[4]

The H-2A program, established at 8 U.S.C. § 1101(a)(15)(H)(ii)(a), was "created by the Immigration and Nationality Act of 1952 [('INA') as] amended by the Immigration Reform and Control Act of 1986" and "permits employers to hire foreign workers to perform temporary agricultural work in the United States."[5]  Under the H-2A program, employers may temporarily hire foreign workers to perform agricultural work "when there are not enough qualified and available American workers to fill open jobs."[6] The United States Attorney General has authority to approve requests to import foreign labor under the H-2A program, after consulting with the Secretary of Labor.[7] Before the Attorney General may approve the importation of a prospective worker under the H-2A program, the prospective employer must certify to the Secretary of Labor that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

---

[3] Teche Vermilion Sugar Cane Growers' Association, Inc. ("Teche"); Cora Texas Growers & Harvesters Agricultural Association, Inc. ("Cora"); American Sugar Cane League ("ASCL"); Four Oaks Farm ("Four Oaks"); Gonsoulin Farms, LLC ("Gonsoulin Farms"); Townsend Brothers Farms, Inc. ("Townsend Brothers"); and John Earles.
[4] Specifically, United States Secretary of Labor Julie Su, in her official capacity; Principal Deputy Assistant Secretary of Labor Brent Parton, in his official capacity; Administrator of the Department of Labor's Office of Foreign Labor Certification Brian Pasternak, in his official capacity; and Administrator of the Department of Labor's Wage and Hour Division Jessica Looman, in her official capacity.
[5] *Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014); 8 U.S.C. § 1101(a)(15)(H)(ii)(a).
[6] *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021)(quoting *Mendoza*, 754 F.3d at 1007). *See also* 20 C.F.R. § 655.103(a)("In order to bring nonimmigrant workers to the United States to perform agricultural work, an employer must first demonstrate to the Secretary [of the DOL] that there are not sufficient U.S. workers able, willing, and qualified to perform the work in the area of intended employment at the time needed and that the employment of foreign workers will not adversely affect the wages and working conditions of workers in the United States similarly employed.").
[7] 8 U.S.C. § 1184(c)(1).

> (B) the employment of the alien in such labor or services **will not adversely affect the wages and working conditions of workers in the United States similarly employed**.[8]

The statute directs the Secretary of Labor to create the regulatory framework for the H-2A program.[9] The DOL is thus tasked with overseeing the H-2A program and promulgating regulations to ensure that temporary nonresident agricultural workers are not paid wages that will "adversely affect" the wages or working conditions of "similarly employed" domestic workers.[10]

The governing statute does not, however, dictate how the DOL is to ensure that the employment of H-2A workers does not adversely the wages and working conditions of domestic workers. The DOL addresses this statutory requirement, in part, by requiring H-2A employers to pay participating workers the highest of the following wage rages applicable to the relevant activity: the adverse effect wage rate ("AEWR"); the prevailing wage; the collectively bargained wage rate; the federal or state minimum wage rate; or "[a]ny other wage rate the employer intends to pay."[11] All occupations in the United States are assigned Standard Occupational Classification ("SOC") codes, which are defined by the nature of the jobs.[12] The DOL calculates AEWRs for each applicable SOC.[13] The parties agree that the AEWR for an occupation effectively "establishes a minimum wage for H-2A visa workers and domestic workers performing the same work."[14]

The methodology for calculating AEWRs has changed over the course of the H-2A program. But, since 1987, the DOL has generally based the AEWR on wage data from the Farm

---

[8] 8 U.S.C. § 1188(a)(1)(A)–(B) (emphasis added).
[9] 8 U.S.C. § 1101(a)(15)(H)(ii)(a).
[10] 8 U.S.C. § 1188(a)(1)(B).
[11] 20 C.F.R. 655.120(a)(1).
[12] For example, "Graders and Sorters, Agricultural Products" (SOC 45-2041) are employees who "[g]rade, sort, or classify unprocessed food and other agricultural products by size, weight, color, or condition," while "Packers and Packagers, Hand" (SOC 53-7064) are those who "[p]ack or package by hand a wide variety of products and materials." ECF No. 3-16.
[13] *Id.*
[14] ECF No. 3 at 3 (Application for Preliminary Injunction ("Application")). *See also, Overdevest,* 2 F.4th at 980–81 (citing *Mendoza,* 754 F.3d at 1008)(the AEWR "provides a wage floor that aims to prohibit employers from underpaying foreign workers and thereby depressing wages for similarly-employed American workers.").

Labor Survey ("FLS"), which is conducted by the United States Department of Agriculture ("USDA").[15] In 2009, the DOL considered incorporating data from the Occupational Employment and Wage Statistics ("OEWS")[16] survey in its AEWR methodology, but determined that the data from this survey was not sufficiently precise to use as the primary basis for its AEWR methodology.[17] In 2020, the DOL altered its AEWR methodology to incorporate FLS wage data when available and, when not available, to supplement it with OEWS wage data.[18] The 2020 Rule was preliminarily enjoined—and ultimately vacated and remanded to the DOL—after the Eastern District of California found that (i) the rule failed to protect U.S. workers against adverse effects, (ii) the DOL failed to explain part of its decision and failed to properly analyze potential harm to U.S. workers, and (iii) the DOL failed to comply with notice-and-comment requirements.[19]

In response to the court's injunction, the DOL issued a notice of proposed rulemaking in December 2021.[20] Prior to the 2021 NPRM, all H-2A jobs within a region or state had one AEWR, namely the wage rate for "Field and Livestock Workers (combined)." The "Field and Livestock Workers (combined)" category is not an SOC, but is a classification that includes six (6) SOCs:

> (1) Farmworkers and Laborers, Crop, Nursery and Greenhouse Workers (45-2092);
> (2) Farmworkers, Farm, Ranch, and Aquacultural Animals (45-2093);
> (3) Agricultural Equipment Operators (45-2091);
> (4) Packers and Packagers, Hand (53-7064);
> (5) Graders and Sorters, Agricultural Products (45-2041); and
> (6) All Other Agricultural Workers (45-2099).[21]

---

[15] ECF No. 3-1 at 9-10 (Application);ECF No. 21 at 12-15 (Opposition to Application).
[16] Formerly the Occupational Employment Statistics ("OES"). The Bureau of Labor Statistics ("BLS") conducts the OEWS.
[17] ECF No. 3-1 at 9-10 (Application); ECF No. 21 at 12-15 (Opposition).
[18] Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 85 Fed. Reg. 70,445 (Nov. 5, 2020)("2020 Rule").
[19] *United Farm Workers v. United States Dep't of Lab.*, 598 F. Supp. 3d 878, 888 (E.D. Cal. 2022).
[20] Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 86 FR 68174-01 (December 1, 2021)("2021 NPRM").
[21] 2021 NPRM at 68179.

Because the H-2A program specifically covers only agricultural labor, and this set of six SOCs captures most agricultural occupations, the DOL calculated one AEWR that applied to all H-2A employees.[22]

The 2021 NPRM proposed adopting the 2020 Rule's new method of calculating AEWRs by using FLS data to calculate H-2A AEWRs whenever possible, and using OEWS when FLS data are not available. OEWS data would also be used for H-2A jobs that do not fall within the "field and livestock workers (combined)" classification, on the grounds that OEWS data are more specific and reliable for such occupations.[23]  Additionally, and relevantly to this dispute, the 2021 NPRM proposed a requirement "that employers pay the highest applicable wage if the job opportunity can be classified within more than one occupation, when those occupations are subject to different AEWRs" (the "Highest AEWR Rule").[24] Under this rule, the DOL would review all aspects of a proposed H-2A job opportunity and identify all the tasks an employee would be required to perform.[25] The DOL would then correlate each of those tasks with the SOC that includes them, and identify the AEWR applicable to each SOC. [26] If an H-2A laborer would be expected to perform tasks falling under distinct SOCs, and those SOCs are associated with different AEWRs, then the employer would be required to pay the highest wage rate among those AEWRs.[27]

This rule would only apply in some situations. For example, an H-2A job opportunity might include some duties classified under SOC 45-2091 (Agricultural Equipment Operators) and others classified under SOC 45-2093 (Farmworkers, Farm, Ranch, and Aquacultural Animals).[28] Since

---

[22] *Id.*
[23] 2021 NPRM at 68181-82.
[24] 2021 NPRM at 68183.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] 88 Fed. Reg. 12760-1 at 12781.

those SOCs are both part of "field and livestock workers (combined)," only the "combined"
AEWR would apply.[29] Regarding agricultural employees who operate heavy trucks, the 2021
NPRM provides the following discussion:

> [A] job opportunity involving driving duties may be properly classified under SOC
> 45-2091 (Agricultural Equipment Operators), SOC 53-3032 (Heavy and Tractor-
> Trailer Truck Drivers), or a combination of the two, depending on the duties
> described in the employer's job order. A job opportunity for workers to drive tractors
> and other mechanized, electrically powered or motor-driven equipment on farms to
> plant, cultivate, and harvest a crop (including driving tractors in and out of fields
> carrying bins and driving forklifts to transfer and stack bins of full product onto
> trailers), which requires 12 months of experience operating such equipment, would
> be properly classified under SOC 45-2091 and subject to the field and livestock
> worker (combined) FLS-based AEWR. In contrast, a job opportunity for workers
> to drive semi tractor-trailer trucks to and from specified destinations within an area
> of intended employment (including maneuvering trucks into and out of loading and
> unloading positions as well as driving in both on-road (paved) and off-road
> conditions), which requires 12 months of experience operating such equipment and
> a valid Class A CDL or equivalent, would be properly classified under SOC 53-
> 3032 and subject to the OEWS-based, occupation-specific AEWR. In the event an
> employer seeks workers to both drive tractors and other mechanized,
> electrically powered or motor-driven equipment on farms and semi tractor-trailer units, as
> described above, the employer's job opportunity constitutes a combination of SOC
> 45-2091 and SOC 53-3032, subject to either the field and livestock worker
> (combined) FLS-based AEWR applicable to SOC 45-2091 or the OEWS-based,
> occupation-specific AEWR applicable to SOC 53-3032, whichever is a higher rate
> per hour.[30]

The DOL accepted comments on the 2021 NPRM until January 31, 2022.[31]

On February 28, 2023, after reviewing comments on the 2021 NPRM, the DOL issued a
final rule, "Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A
Nonimmigrants in Non-Range Occupations in the United States," 88 FR 12760-01 (the "Final
Rule"). The Final Rule includes the Highest AEWR Rule, which is codified at 20 C.F.R. §§
655.103(b) and 120(b)(1), (2), and (5). In the Final Rule, the DOL substantially reiterated its

---

[29] Id.
[30] 2021 NPRM at 68183-84.
[31] 2021 NPRM.

analysis from the 2021 NPRM regarding opportunities that require agricultural laborers to occasionally operate heavy trucks:

> The Department acknowledges that some H-2A job opportunities involving truck driving would not appropriately be classified as SOC code 53-3033 (Light Truck Drivers) or SOC code 53-3032 (Heavy and Tractor-Trailer Truck Drivers) based on the equipment, vehicle weight, location, and other factors involved, as discussed above. However, the Department disagrees that SOC code 45-2091 (Agricultural Equipment Operators) is the only SOC code appropriate for truck-driving duties listed on an H-2A application. As discussed in the NPRM, an H-2A job opportunity requiring a worker to operate semi-trucks with at least 26,001 pounds Gross Vehicle Weight (GVW), whether a commercial driver's license is required or not, over public roads (e.g., hauling the crops away from the farm to market, to a packing facility, or to storage) would likely result in the [certifying officer] assigning SOC code 53-3032 (Heavy and Tractor-Trailer Truck Drivers). Thus, the Department views operating semi-trucks hauling commodities over public roads to generally involve the same or similar skills, qualifications, and tasks, whether the commodity is agricultural or nonagricultural in nature.[32]

The Final Rule went into effect March 30, 2022.[33]

Plaintiffs filed suit challenging the Final Rule and, specifically, the Highest AEWR Rule.[34] Plaintiffs argue that under the scheme in place prior to the Final Rule, H-2A workers whose tasks are primarily agricultural and only occasionally include driving heavy trucks on public roads were previously classified as SOC 45-2091 (Agricultural Equipment Operators), which is part of "field and livestock workers (combined)." Under the Final Rule, such workers must now be reclassified as heavy truck drivers (SOC 53-3032, Heavy and Tractor-Trailer Truck Drivers) and must be paid the higher wage rate associated with the latter classification.[35] Plaintiffs argue that this reclassification is improper, as these laborers are agricultural workers who perform many functions, only one of which is driving heavy trucks on public roads, and they should not be

---

[32] 88 Fed. Reg. 12760-1 at 12782.
[33] *Id.*
[34] ECF No. 1 (Complaint for Declaratory and Preliminary and Permanent Injunctive relief (Declaratory Relief Requested; Preliminary and Permanent Injunctive Relief Requested)("Complaint")).
[35] *Id.* at 19-20.

reclassified as non-agriculture-specific heavy truck drivers simply because they occasionally drive heavy trucks.[36] Plaintiffs assert that the Highest AEWR Rule will require farm operators like them to pay occasional truck drivers nearly double what they would be paid under the prior method of calculation, which will have harmful consequences on Plaintiffs, the workers, and the United States economy as a whole.[37]

Plaintiffs assert that the Final Rule (1) violates the Administrative Procedure Act ("APA") because it exceeds the DOL's statutory mandate; (2) violates the APA because it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law; (3) violates the Congressional Review Act ("CRA"); and (4) violates the Regulatory Flexibility Act ("RFA").[38] Plaintiffs seek (1) a preliminary injunction prohibiting the DOL from enacting or enforcing the Final Rule or the Highest AEWR Rule: (2) a preliminary injunction directing the DOL to process H-2A applications using the AEWRs applicable prior to the Final Rule; (3) a declaratory judgment that the Final Rule "and its methodology for calculating the AEWR" are invalid; (4) an order vacating the Final Rule and permanently enjoining its enforcement; and (5) costs and expenses, including attorney fees.[39]

Plaintiffs later applied for a preliminary injunction,[40] asking the Court to (1) enjoin the DOL from enforcing the Final Rule within Louisiana; (2) enjoin the DOL from requiring employers to advertise wages other than those in place before the Final Rule was promulgated; (3) enjoin the DOL from requiring H-2A employers to pay wage rates "resulting from the Final Rule's methodology;" and (4) require the DOL to amend and reissue any H-2A certifications issued prior

---

[36] *Id.*
[37] *Id.* at ¶ 61.
[38] *Id.* at 28-33.
[39] *Id.* at 33-34.
[40] ECF No. 3 (Application for Preliminary Injunction ("Application")).

to any injunction in conformity with the court's orders.[41] Plaintiffs allege the economic damages they will incur as a result of the Final Rule constitute irreparable injury because they are "nonrecoverable costs of complying with a putatively invalid regulation."[42] Defendants opposed the Application,[43] and Plaintiffs filed a reply in support.[44] The Court granted leave to Jesus Ignacio Diaz Castro, Ricardo Guadalupe Arce Ruiz, James Simpson, and Farmworker Justice to file as *amici curiae* a brief in support of Defendants' opposition to the Application.[45] Plaintiffs filed a reply in response to the *amici* brief.[46]

Defendants filed a partial motion to dismiss, seeking to dismiss five plaintiffs for lack of standing, the CRA claim for lack of jurisdiction or failure to state a claim upon which relief can be granted, and the RFA claim for failure to state a claim upon which relief can be granted.[47] Plaintiffs opposed the motion,[48] and Defendants filed a reply in support.[49]

In response to the motion to dismiss, Plaintiffs filed a First Amendment to Complaint for Declaratory and Preliminary and Permanent Injunctive Relief[50] ("Amended Complaint"), adding allegations in support of the RFA claim. Defendants then moved to dismiss the Amended Complaint.[51] Plaintiffs opposed that motion,[52] and Defendants filed a reply in support.[53]

---

[41] *Id.* at 9-10.
[42] *Id.* at 29.
[43] ECF No. 21.
[44] ECF No. 28.
[45] ECF No. 25. The *amici* consist of two Mexican citizen truck drivers who have been employed via the H-2A program and intend to be so employed in the future, a domestic agricultural truck driver, and a nonprofit organization that conducts advocacy, education, and training for and on behalf of H-2A and United States agricultural workers.
[46] ECF No. 29.
[47] ECF No. 32.
[48] ECF No. 34.
[49] ECF No. 36.
[50] ECF No. 35.
[51] ECF No. 37.
[52] ECF No. 41.
[53] ECF No. 42.

## II.
### MOTIONS TO DISMISS

Defendants first move to dismiss the claims of certain plaintiffs on the grounds that they lack standing. Alternatively, Defendants move to dismiss all Plaintiffs' CRA claims on the grounds that this Court lacks subject matter jurisdiction over them, or alternatively that Plaintiffs have failed to state a claim under the CRA upon which relief can be granted.[54] Defendants also move to dismiss the RFA claims on the grounds that Plaintiffs have failed to state a claim upon which relief can be granted.[55] In response, Plaintiffs filed the Amended Complaint, which added three paragraphs to the Original Complaint. In the Amended Complaint, Plaintiffs assert that the Final Rule violates the RFA because the Final Rule's 5 U.S.C. § 605(b) certification was issued by someone other than the Secretary of Labor, so the DOL was required to conduct full initial and final analyses of the Final Rule's impact on small entities, under 5 U.S.C. §§ 603 and 604, which it did not do.[56] Plaintiffs additionally assert that the DOL "failed to take reasonable steps to confirm that the [section 605(b)] certification was valid" and "failed to develop any factual basis" that could form the basis of a reasonable estimate of the Final Rule's impact on small entities.[57] Defendants moved to dismiss the Amended Complaint on similar grounds asserted in their Opposition to the Application.[58]

### A.  **Standing**.

Defendants move to dismiss the claims of five Plaintiffs—ASCL, Gonsoulin Farms, Four Oaks, Townsend Brothers, and John Earles—on the grounds that they lack standing to challenge the Final Rule under the APA or the RFA because they have not alleged any past or imminent injury

---

[54] ECF No. 32-1 at 19-20.
[55] *Id.* at 21-22.
[56] ECF No. 35.
[57] *Id.*
[58] ECF No. 37.

resulting from the Final Rule, and therefore this Court has no jurisdiction over their claims.[59] Plaintiffs argue that the Court has jurisdiction over all of their claims so long as any one of the Plaintiffs has standing to bring each claim in the Complaint.[60] Defendants contend that this "one-plaintiff rule" only applies in appellate review, so it does not allow the Plaintiffs to forego proving that each party has separate standing to bring each separate claim in the Complaint.[61]

Motions filed under Federal Rule of Civil Procedure 12(b)(1) permit a party to challenge a court's subject-matter jurisdiction to hear a case. A district court may dismiss an action for lack of subject-matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, as well as the court's resolution of disputed facts.[62] The burden of proof is on the party asserting jurisdiction.[63] At the motion to dismiss stage, this requires a plaintiff to allege "a plausible set of facts establishing jurisdiction."[64]

Standing—*i.e.*, "the power of the court to entertain the suit"—is the "threshold question in every federal case."[65] Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."[66] Standing to sue is a jurisprudential doctrine used to ensure federal courts do not exceed their limited authority over cases and controversies.[67] Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."[68] In its simplest terms, "the question of standing is whether the litigant is entitled to

---

[59] ECF No. 32-1 at 14-20.
[60] ECF No. 34 at 14-20.
[61] ECF No. 36 at 1-4.
[62] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Willoughby v. U.S. Dept. of the Army*, 730 F.3d 476, 479 (5th Cir. 2013).
[63] *McMahon v. Fenves*, 946 F.3d 266, 270 (5th Cir. 2020); *Ramming*, 281 F.3d at 161.
[64] *McMahon*, 946 F.3d at 270 (quoting *Physician Hosps. of Am. v. Sebelius*, 691 F3d 649, 652 (5th Cir. 2012)).
[65] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).
[66] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const., Art. III, § 2).
[67] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[68] *Spokeo*, 578 U.S. at 338.

have the court decide the merits of the dispute or of particular issues."[69] The "irreducible constitutional minimum" of standing consists of three elements which the plaintiff must satisfy: (1) the plaintiff suffered an injury in fact—*i.e.*, a concrete and particularized invasion of a legally protected interest; (2) the injury is fairly traceable to the challenged conduct of the defendant, which means there must be a causal connection between the injury and the conduct complained of; and (3) it is likely (as opposed to merely speculative) that the injury will be redressed by a favorable judicial decision.[70]

A plaintiff must have standing for each claim asserted and for each form of relief sought, particularly when a plaintiff asserts multiple claims or seeks multiple forms of relief.[71] A case or controversy involving multiple plaintiffs can be heard so long as at least one plaintiff has standing for each claim or form of relief sought.[72]

Defendants cite *TransUnion LLC v. Ramirez*[73] as support for their claim that each of the Plaintiffs must show they have separate standing for each claim and request for relief made in the Complaint.[74] However, *TransUnion* concerned a class action in which the plaintiffs sued the defendant for violating a regulation by adding false or misleading information to their credit

---

[69] *Warth*, 422 U.S. at 498.

[70] *Spokeo*, 578 U.S. at 338, 339; *see also Lujan*, 504 U.S. at 560.

[71] *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *El Paso County, Texas v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439, 137 S. Ct. 1645, 1650, 198 L. Ed. 2d 64 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)).

[72] *Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 467 (5th Cir. 2024)(citing *Town of Chester*, 581 U.S. at 439); *Biden v. Nebraska*, 143 S. Ct. 2355, 2365, 216 L. Ed. 2d 1063 (2023)(citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52, n. 2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006)("… the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."); *see also Bowsher v. Synar*, 478 U.S. 714, 721, 106 S. Ct. 3181, 3185, 92 L. Ed. 2d 583 (1986)(holding that when members of Congress, a federal employees' Union, and Union members all claimed a law was unconstitutional, the Union members' having Article III standing was sufficient to allow the case to move forward as to all plaintiffs); *see also, California v. Env't Prot. Agency*, 72 F.4th 308, 313 (D.C. Cir. 2023)("under the one-plaintiff rule, only one of the petitioners needs to have standing to permit us to consider the petition for review")(quoting *Massachusetts v. EPA*, 549 U.S. 497, 510–11, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007)).

[73] 594 U.S. 413, 141 S. Ct. 2190, 2197, 210 L. Ed. 2d 568 (2021).

[74] ECF No. 36 at 5-6.

reports, and sought recovery for physical, monetary, or reputational damages. There, the Supreme Court determined that most of the plaintiffs had not shown for summary judgment purposes that the false information had been disclosed to any third parties, and therefore had not shown any injury.[75] This case is thus more similar to *Louisiana v. United States Dep't of Energy*,[76] or *California v. Env't Prot. Agency*,[77] in which the plaintiffs alleged the regulation itself is injurious because it violates statute or the Constitution, and all plaintiffs seek the same relief for the same agency action.

Defendants only challenge the standing of five of the seven Plaintiffs, and do not dispute that Teche and Cora have standing to make each of the claims in the Complaint and seek each type of relief requested. Accordingly, at least one plaintiff has standing to bring the claims in the Complaint, so this matter is justiciable under Article III.

Defendant's motion to dismiss the five identified plaintiffs for lack of standing is DENIED.

**B.  Rule 12(b)(1) Motion to Dismiss Plaintiffs' CRA Claim.**

Plaintiffs claim that the Final Rule violates the CRA because it is a "major rule" under that statute, and the DOL failed to submit the Final Rule for a congressional review before it went into effect, as required by 5 U.S.C. § 801.[78] Defendants argue that the CRA prohibits judicial review of challenges brought under it, so this Court does not have jurisdiction over Plaintiffs' claim.[79] Alternatively, they assert the Final Rule is not a major rule for CRA purposes.[80] Plaintiffs dispute both assertions.[81]

---

[75] 594 U.S. 413, 141 S. Ct. 2190, 2197, 210 L. Ed. 2d 568 (2021).
[76] 90 F.4th 461, 467 (5th Cir. 2024).
[77] 72 F.4th 308, 313 (D.C. Cir. 2023).
[78] ECF No. 1 at ¶ 103.
[79] ECF No. 32-1 at 19-20.
[80] *Id.*
[81] ECF No. 34 at 21-27.

The question here is one of statutory interpretation. When interpreting statutory language, "statutory terms are generally interpreted in accordance with their ordinary meaning."[82] The Court must "interpret the words consistent with their ordinary meaning ... at the time Congress enacted the statute."[83] However, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[84] The Court must not hold to the ordinary meaning of statutory terms if the context "suggests some other meaning."[85]

Under the CRA, before an agency promulgates a rule, it must provide reports to Congress and the Comptroller General regarding the content of the rule, including whether it is a "major rule" and the proposed effective date for the rule.[86] The CRA creates a sixty-day period before major rules may take effect.[87] Congress and the President may undertake review of proposed major rules in that period, and may take steps to prevent them from going into effect.[88] Under 5 U.S.C. § 805, "[n]o determination, finding, action, or omission under [the CRA] shall be subject to judicial review." Whether section 805 absolutely precludes review of challenges under the CRA has not been addressed by the Fifth Circuit, and is far from settled in other circuit and district courts.[89] Several circuit courts have held that section 805 strips courts of jurisdiction to review any challenge to acts or omissions under the CRA, as per the statute's plain language.[90] Other circuit

---

[82] *Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, 103 F.4th 1097, 1110 (5th Cir. 2024)(quoting *Sebelius v. Cloer*, 569 U.S. 369, 376, 133 S.Ct. 1886, 185 L.Ed.2d 1003 (2013)).

[83] *Id.* (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 138 S. Ct. 2067, 2070, 201 L.Ed.2d 490 (2018))

[84] *Id.* (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101, 132 S.Ct. 1350, 182 L.Ed.2d 341 (2012)).

[85] *Id.* (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012)).

[86] 5 U.S.C. § 801(a).

[87] 5 U.S.C. § 801(a)(3).

[88] 5 U.S.C. § 801(a)-(c).

[89] § 8213 Congressional Review Act, 32 Fed. Prac. & Proc. Judicial Review § 8213 (2d ed.).

[90] *Id.*, *citing Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020); *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 346 (D.C. Cir. 2018); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009); *Via Christi Regional Medical Ctr. v. Leavitt*, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007)(*abrogated on other grounds by, Azar v. Allina Health Services*, 139 S. Ct. 1804, 204 L. Ed. 2d 139 (2019)).

and district courts have concluded that some species of review are not barred,[91] including this one in a previous case.[92]

Plaintiffs acknowledge the unsettled nature of this question but argue section 805 does not bar review of their challenge. They assert that they "are not seeking review of any action or inaction by the DOL," only seeking to enforce provisions of the CRA "that require certain events to occur 'before a rule can take effect.'"[93] They suggest that the CRA creates a "freeze" of all agency rules, regardless of agency action, and that an agency can lift the freeze by submitting the reports required by section 801(a).[94] Alternatively, Plaintiffs assert the Court has jurisdiction over their CRA claim because the DOL's failure to submit the Final Rule to Congressional review constitutes a "plain violation of an unambiguous and mandatory" statutory provision, under *Leedom v. Kyne*.[95]

The Court agrees with those courts who have found that section 805 precludes judicial review. Having reviewed cases that analyze section 805, the Court finds the Tenth Circuit's analysis in *Kansas Nat. Res. Coal. v. United States Dep't of Interior*[96] to be thorough and persuasive. There, the plaintiff alleged that the United States Department of Interior failed to submit a rule to Congress for review, thereby violating an obligation created by section 801(a)(1)(A), and the court held that review of that claim was barred by section 805. As the court noted in *Kansas*, the plain language of section 805 bars judicial review of alleged actions or

---

[91] *Id.*, *citing Tugaw Ranches, LLC v. U.S. Dep't of Interior*, 362 F.Supp.3d 879, 884-886 (D. Idaho 2019) (canvassing case law and holding that court had jurisdiction to review claim that agencies had violated CRA by failing to submit rules for review); *compare with Kansas Natural Resources Coalition v. U.S. Department of the Interior*, 382 F.Supp.3d 1179 (D. Kan. 2019) (holding CRA prohibited review of claim that agency had failed to submit rule to Congress and Comptroller General) *aff'd*, 971 F.3d 1222 (10th Cir. 2020).

[92] *United States v. Reece*, 956 F. Supp. 2d 736 (W.D. La. 2013)(analyzing the meaning of certain terms in the CRA and deciding whether an agency was required to comply with certain obligations under the statute in light of that analysis).

[93] ECF No. 34 at 24.

[94] *Id.* at 24-25.

[95] 358 U.S. 184, 188, 79 S. Ct. 180, 184, 3. L.Ed.2d 210 (1958).

[96] 971 F.3d 1222, 1230 (10th Cir. 2020).

omissions under the CRA, and the canons of statutory interpretation support that reading as well.[97] Nonetheless, the Tenth Circuit also reviewed relevant legislative history, including explanatory statements made by legislators before and after passage of the CRA.[98] A post-passage statement expressed the intent that courts may not review "major rule determinations" or "whether Congress complied with the [CRA's] congressional review procedures."[99] The statement noted, however, that courts were not intended to be prohibited "from giving effect to a resolution of disapproval that was enacted into law," and the authors "expect[ed]" that a court "might recognize that a rule has no legal effect due to the operation of subsections 801(a)(1)(A) [requiring the submission of reports] or 801(a)(3) [providing effective dates for agency rules]."[100] As the court in *Kansas* notes, however, these statements were not available at the time the CRA was passed, and, moreover, such statements are not controlling when they contradict the plain language of the statute.[101] Therefore, judicial review of Plaintiffs' CRA claims is barred.

The Court is not persuaded by Plaintiffs' characterization of their CRA claim in their opposition to the partial motion to dismiss. In the opposition, Plaintiffs claim they are not seeking review of an action or inaction by the DOL.[102] However, the Complaint alleges that the Final Rule "violates the [CRA] because the DOL <u>failed</u> to seek congressional review at least [sixty days] prior to the effective date of the [Rule], even though the Final Rule is estimated to have an economic impact of greater than $100 million. 5 U.S.C. § 801."[103] The plain implications of this language are that Plaintiffs assert that the Final Rule is a "major rule" under 5 U.S.C. § 804, which obligated the DOL—under section 801(a)(1)—to submit certain reports to Congress and meant that the Final

---

[97] *Id.* at 1235-37.
[98] *Id.* at 1227-28.
[99] *Id.*
[100] *Id.*
[101] *Id.* at 1237.
[102] ECF No. 34 at 24.
[103] ECF No. 1 at ¶ 71 (emphasis added); *see also* ECF No. 1 at ¶ 103.

Rule would go into effect at least sixty days after submission of those reports, but the DOL failed to submit those reports, thus violating its obligation under section 801(a)(1). As in *Kansas*, Plaintiffs seek judicial review of an alleged failure by an agency to comply with an obligation imposed by section 801 of the CRA, which is barred by section 805.

Additionally, *Leedom* does not support Plaintiffs' CRA claim. In that case, an association was formed to collectively bargain on behalf of professional employees at a Westinghouse plant, and that association petitioned the National Labor Relations Board ("NLRB") to be certified as the exclusive bargaining agent for the professional employees.[104] In response, the NLRB expanded the bargaining unit to include certain nonprofessional employees, denied the association's request for a vote among the professional employees on whether to include the nonprofessional employees, and ordered an election to determine which of two associations would represent that expanded unit.[105] The National Labor Relations Act, however, explicitly required a vote among professional employees before a bargaining unit for professional employees could include nonprofessional employees.  Therefore, it was undisputed that the NLRB "had acted in excess of its powers and had thereby worked injury to the statutory rights of the professional employees."[106] The Supreme Court held that, while the National Labor Relations Act might preclude judicial review of NLRB actions within its delegated powers, review was available of actions that exceeded the NLRB's statutory authority, including when it violated the clear meaning of the Act (akin to review under the APA on the same grounds).[107] The court reasoned, in part, that foreclosing judicial review when the NLRB had exceeded its authority and violated the rights of covered workers would mean "a sacrifice or obligation of a right which Congress" had explicitly granted to the people covered by

---

[104] *Leedom,* 358 U.S.
[105] *Id.* at 185-87.
[106] *Id.* at 187.
[107] *Id.* at 184.

the relevant statute.[108] By contrast, the CRA enables review of agency rules by Congress and the

President, it does not grant rights to H-2A employers or their advocates. Therefore, giving effect

to the plain language of section 805 does not deprive Plaintiffs of a right they have been granted

by statute.

Plaintiffs have not carried their burden of proving the Court has jurisdiction over their CRA

claim. Accordingly, Defendants' motion to dismiss the CRA claim for lack of jurisdiction is

GRANTED.

In light of this finding, the Court need not determine whether Plaintiffs have stated a claim

under the CRA upon which relief can be granted.

### C. Motions to Dismiss Plaintiffs' RFA Claim.

Defendants move to dismiss Plaintiffs' RFA claim for failure to state a claim pursuant to

Rule 12(b)(6). Rule 12(b)(6) motions are appropriate when a defendant attacks the complaint

because it fails to state a legally cognizable clam.[109] Such a motion "admits the facts alleged in the

complaint, but challenges plaintiff's rights to relief based upon those facts."[110] To overcome a Rule

12(b)(6) motion, a complaint must contain sufficient factual matter to state a claim to relief that is

plausible on its face.[111] The plausibility standard is met "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."[112] Although a complaint does not need detailed factual allegations, "it demands more

than an unadorned, the-defendant-unlawfully-harmed-me accusation."[113] A pleading that merely

---

[108] *Id.*.

[109] *Ramming*, 281 F.3d at 161.

[110] *Id.* at 161–62.

[111] *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011).

[112] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level," and not merely create "a suspicion [of] a legally cognizable right of action.") (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-36 (3d ed. 2004)).

[113] *Id.*

offers "labels and conclusions" or "a formulaic recitation of the elements" will not suffice,[114] nor

will a complaint that merely tenders "naked assertions devoid of further factual enhancement."[115]

When deciding a Rule 12(b)(6) motion, "[t]he court accepts all well-pleaded facts as true, viewing

them in the light most favorable to the plaintiff."[116] However, this tenet does not apply to

conclusory allegations, unwarranted deductions, or legal conclusions couched as factual

allegations, as such assertions do not constitute "well-pleaded facts."[117] In considering a Rule

12(b)(6) motion, the district court generally "must limit itself to the contents of the pleadings,

including attachments thereto."[118] One exception to this rule is that district courts "may

permissibly refer to matters of public record."[119]

Under the RFA, when an agency promulgates a rule which requires notice and a period of

comment, it generally must issue both initial and final regulatory flexibility analyses.[120] Those

analyses must include several components, but most relevant here is 5 U.S.C. § 604(a)(6), which

requires a final rule to include:

> [A] description of the steps the agency has taken to minimize the significant
> economic impact on small entities consistent with the stated objectives of
> applicable statutes, including a statement of the factual, policy, and legal reasons
> for selecting the alternative adopted in the final rule and why each one of the other
> significant alternatives to the rule considered by the agency which affect the impact
> on small entities was rejected.

However, under 5 U.S.C. § 605(b), agencies do not need to issue regulatory flexibility analyses if:

> [T]he head of the agency certifies that the rule will not, if promulgated, have a
> significant economic impact on a substantial number of small entities. If the head

---

[114] *Twombly*, 550 U.S. at 555.

[115] *Iqbal*, 556 U.S. at 678 (internal quotation marks, alterations omitted) (quoting *Twombly*, 550 U.S. at 557).

[116] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted); *see also Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

[117] *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

[118] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

[119] *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005).

[120] 5 U.S.C. §§ 603, 604.

of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification.

Compliance with sections 604 and 605(b) is subject to judicial review.[121] However, that review is only to determine "whether an agency has made a reasonable, good-faith effort to carry out the mandate of the RFA."[122] The RFA imposes procedural, not substantial, requirements,[123] and judicial review is "'highly deferential' as to the substance of the analysis, particularly where an agency is predicting the likely economic effects of a rule."[124]

The Complaint asserts the following to show that the Final Rule violates the RFA: the "DOL has conceded it made no attempt to procure any data from which it could" estimate the Final Rule's impact on small entities;[125] the Final Rule "fails to provide a meaningful comparative analysis" between the Highest AEWR Rule and "significant alternatives" proposed in public comments;[126] and the Final Rule "does not offer any empirical, or otherwise reasonable, explanation to support its rejection" of those alternative proposals.[127] In the Amended Complaint, Plaintiffs add that the Final Rule's section 605(b) certification was not made by the "head of the agency" so it has no effect, and the DOL was thus required to conduct initial and final small entity economic impact analyses.[128] The DOL does not dispute that it did not conduct small entity economic impact analyses. Plaintiffs allege that in light of the DOL's failures to acquire economic

---

[121] 5 U.S.C. § 611(a)(1). There is no dispute that Plaintiffs constitute small entities under the RFA.
[122] *Alenco Commc'ns, Inc. v. F.C.C.*, 201 F.3d 608, 625 (5th Cir. 2000)(quoting *Associated Fisheries, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir.1997)).
[123] *Id.*
[124] *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015)(quoting *Helicopter Ass'n Int'l, Inc. v. F.A.A.*, 722 F.3d 430, 438 (D.C. Cir. 2013)).
[125] ECF No. 1 at ¶ 107.
[126] *Id.* at ¶¶ 107-11.
[127] *Id.*
[128] ECF No. 37.

data and to explain its rejection of proposed alternatives, the Final Rule should be vacated and remanded to the DOL with instructions to perform that analysis.[129]

Defendants assert that these allegations fail to state a claim that the Final Rule violates the RFA because the section 605(b) certification was made by the proper person, and the economic analysis in the Final Rule is sufficient.

### a.   Did the Head of the Agency make the section 605(b) Certification?

Plaintiffs assert that the Final Rule violates the RFA because the Rule (and its including its regulatory flexibility analysis) is signed by Brent Parton, Acting Assistant Secretary for Employment and Training, Labor ("Assistant Secretary"), rather than the Secretary of Labor.[130] Plaintiffs imply without support that "head of the agency" can only refer to the Secretary of Labor for purposes of a section 605(b) certification. Defendants argue this conclusion is erroneous for two reasons. First, the Assistant Secretary is the head of the Employment and Training Administration ("ETA"), which is a body within the DOL, and the Secretary of Labor has delegated to the head of ETA the authority to conduct activities that include determining H-2A AEWRs.[131] Therefore, the Assistant Secretary is the "head of the agency" authorized to make the Final Rule's section 605(b) certification.[132] Alternatively, statute contradicts Plaintiffs' implication that "agency" as used in section 605(b) must refer to cabinet-level agencies, and allows for the heads of sub-agencies to make a section 605(b) certification.[133]

The question here is one of the interpretation of "agency" as it appears in section 605(b). As noted above, such analysis begins with the plain meaning of the statutory terms, unless context

---

[129] ECF No. 1 at ¶¶ 112-13.
[130] ECF No. 3-1 at 27.
[131] ECF No. 21 at 26.
[132] *Id.*
[133] *Id.*; 5 U.S.C. § 551(1).

suggests another meaning. For purposes of section 605, "the term 'agency' means an agency as defined in section 551(1)" of Title 5.[134] Under 5 U.S.C. § 551(1), "'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency." Therefore, as Defendants point out, the "head of the agency" who makes a section 605(b) certification can be the head of a sub-agency, and does not need to be a Secretary or other cabinet-level authority.

Furthermore, DOL regulations show that since at least 2010, the Assistant Secretary has been delegated most of DOL's responsibility for carrying out the H-2A program, as head of the ETA. Specifically, a 2010 DOL regulation[135] provides that the Secretary of Labor has delegated to the Assistant Secretary authority and responsibility relative to carrying out the DOL's obligations under the INA—i.e., including the H-2A program—except for those powers otherwise delegated in Order 9-2009[136] (later amended to Order 5-2010[137]). Order 5-2010 delegated to the Administrator of DOL's Wage and Hour Division certain responsibilities related to the H-2A program, but only DOL's responsibilities under 8 U.S.C. § 1188(g)(2),[138] which authorizes DOL to take action to enforce employer compliance with H-2A rules. The statute giving rise to the AEWR and its method of calculation, by contrast, is located in section 1188(a)(1), which therefore remains in the purview of the ETA, which is headed by the Assistant Secretary. Accordingly, the Secretary of Labor has delegated to an agency within DOL the authority and responsibility to

---

[134] 5 U.S.C. § 601(1).
[135] Delegation of Authority and Assignment of Responsibility; Secretary's Order 6-2010, 75 FR 66268-01 ("Order 6-2010").
[136] *Id.*
[137] Delegation of Authorities and Assignment of Responsibilities, 75 FR 55352-03 ("Order 5-2010").
[138] *Id.* at 55353.

establish AEWRs, so the head of that sub-agency is qualified to make the section 605(b) certification in a regulation that affects the calculation of AEWRs.[139]

In sum, Plaintiffs have not stated a claim that the Final Rule violates the RFA because the head of the agency did not make the section 605(b) certification. Defendants' motion is GRANTED as to that claim.

### b.  Did the Section 605(b) Certification Lack a Factual Basis?

Second, Plaintiffs argue that the factual basis that supports the 605(b) certification fails to comply with the RFA because it is based on insufficient data.[140] Plaintiffs take issue with the fact that the DOL conducted its analysis on the basis of data from approximately 2,600 H-2A employers, despite the fact that approximately 9,900 employers participate in the H-2A program.[141] Plaintiffs also adopt the complaints of the Small Business Administration ("SBA"), which opined that the DOL underestimated the economic impact of the Final Rule on small entities and recommended that DOL consider alternatives such as a "primary duty" test to determine which AEWR should apply to an H-2A employee.[142] Defendants contend that the Final Rule's economic analysis is reasonable and sufficiently explained, and that the analysis was performed on all the commercial data available to the DOL.[143] Plaintiffs do not assert that additional data were

---

[139] Furthermore, the Final Rule itself states that it was promulgated by "AGENCY: Employment and Training Administration, Department of Labor."[139]
[140] ECF No. 3-1 at 27-28.
[141] *Id.*
[142] *Id.* Specifically, SBA's concerns included: the Final Rule would increase the wages of workers who only occasionally drive trucks; under the new scheme, H-2A employers would have to submit multiple applications and pay multiple fees; small farms rely on workers who are not specialized, but the Rule would encourage or require specialization; paying different rates to workers who mostly do the same tasks—on the grounds that some of their tasks differ—could introduce disharmony into the work place; and all of the above would increase costs, making American farms less competitive. ECF No. 3-13 (SBA Letter).
[143] ECF No. 21 at 28-29.

available, but argue that the DOL did not reveal its methodology and that therefore the DOL's conclusions are not reasonable.[144]

Plaintiffs cite *Nat'l Fed'n of Indep. Bus. v. Perez*[145] and *N. Carolina Fisheries Ass'n, Inc. v. Daley*[146] in support of their claim that DOL's certification is insufficient under section 605(b).  In *Perez*, the court found that the RFA analysis was insufficient because DOL "failed to consider the ramifications that its New Rule would have on" an entire class of affected entities.[147] There, the DOL issued a new interpretive rule regarding the disclosures required of consultants, who must file one or more of three different types of reports (LM-20, LM-10, and LM-21). The DOL, however, failed to consider at all the effect on consultants who must file LM-21 reports.[148] This omission was intentional, as DOL "left such concerns to a separate rulemaking" to be issued later.[149]

In *Daley*,[150] the court concluded that the Department of Commerce's court-ordered RFA analysis failed to comply with the statutory requirements because the Secretary of Commerce chose not to tailor the analysis, thus making its conclusions unreliable, and "completely ignored readily available data."[151] There, correspondence showed that "the Secretary's designees consciously ignored the Fisheries Service's own data and selected a flawed methodology," leading to the result that "the Secretary's own compiled data is contradictory and confounding."[152] In other words, while the Final Rule does include an economic analysis, that fact alone does not render it sufficient or protect it from judicial review.

---

[144] ECF No. 3-1 at 27-28.
[145] No. 5:16-CV-00066-C, 2016 WL 3766121 (N.D. Tex. June 27, 2016).
[146] 27 F. Supp. 2d 650 (E.D. Va. 1998)
[147] *Perez*, 2016 WL 3766121, at *38.
[148] *Id.*
[149] *Id.*
[150] *Daley*, 27 F. Supp. 2d 650.
[151] *Daley*, 27 F. Supp. 2d at 659-61.
[152] *Daley*, 27 F. Supp. 2d at 659-61.

Plaintiffs' allegations that the analysis supporting the section 605(b) certification was insufficient, raise issues of fact that cannot be determined at this stage. Section 605(b) does not require the extensive analysis of sections 603 or 604, but it does require "a statement providing the factual basis" for the conclusion that the rule will not "have a significant economic impact on a substantial number of small entities." The Final Rule does include discussion of the analysis that forms the basis of the 605(b) certification, including mention of some alternatives that were considered. However, as the Court previously discussed, it is possible for such statements to be so lacking that they constitute a violation of the RFA. Plaintiffs allege, for instance, that the DOL "conceded it made no attempt to procure" data that could form the basis of a section 605(b) certification.[153] While Plaintiffs' factual allegations regarding their RFA claim are sparse, at this stage, the allegations are sufficient to survive dismissal.

Accordingly, Defendants' motion to dismiss Plaintiffs' RFA claim under Rule 12(b)(6) on the grounds of insufficient economic analysis is DENIED.

### III.
### MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs' Motion requests that the Court enter a preliminary injunction enjoining the DOL from enforcing the Final Rule with respect to the change in the AEWR determination for H-2A workers employed by Plaintiffs to haul sugarcane using heavy and tractor-trailer trucks. Plaintiffs ground their request for injunctive relief on their APA claims that the Final Rule violates 8 U.S.C. §1188(a) and that the DOL's promulgation of the Final Rule was arbitrary and capricious. Alternatively, Plaintiffs seek injunctive relief on the grounds that the Final Rule violates the Regulatory Flexibility Act.

---

[153] ECF No. 1 at ¶ 107.

A.  **Requirements For Injunctive Relief.**

A preliminary injunction is an extraordinary remedy.[154] A preliminary injunction is intended to preserve the status quo to "protect [the] plaintiff from irreparable injury and preserve the court's power to render a meaningful decision after a trial on the merits."[155] A preliminary injunction requires proof of four elements: (1) a substantial threat of irreparable injury; (2) a substantial likelihood of success on the merits; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.[156] The movant must "clearly carr[y] the burden of persuasion on all four requirements."[157]

B.  **Likelihood of Success**

Proof of a substantial likelihood of success on the merits "is arguably the most important" of the elements required for injunctive relief.[158] With respect to this element, "substantial" does not mean "certain."[159] In other words, a plaintiff need not prove "its entitlement to summary judgment in order to establish a substantial likelihood of success on the merits."[160] But at a minimum, it must "present a substantial case on the merits."[161]

---

[154] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).
[155] 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2947 (3d ed.).
[156] *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).
[157] *Id.*
[158] *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).
[159] *Byrne v. Roemer*, 847 F.2d 1130, 1133 (5th Cir. 1988) (explaining that "the movant need not always show a probability of success on the merits") (quoting *Celestine v. Butler*, 823 F.2d 74, 77 (5th Cir. 1987)); *see Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish*, 849 F.3d 615, 626 (5th Cir. 2017) ("Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits before the court may proceed to assess the remaining requirements.").
[160] *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (internal quotation marks omitted).
[161] *Byrne*, 847 F.2d at 1133(quoting *Celestine*, 823 F.2d at 77).

### 1. Does the Final Rule Exceed the DOL's Statutory Authority?

Plaintiffs argue that the Final Rule exceeds the DOL's statutory authority because it bases the AEWR for certain agricultural jobs on non-agricultural SOC codes. Specifically, they challenge the DOL's decision to base the AEWR for H-2A workers who haul sugarcane from the field to the processing plants using heavy or tractor-trailer trucks on the wage rates for a SOC code that includes non-agricultural heavy truck drivers.

### a. The Relevant APA Standard and the Impact of *Loper Bright Enter.*

The APA provides that a "reviewing court shall … hold unlawful and set aside agency action … found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[162] Until the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*,[163] Courts generally applied the two-step *Chevron* framework in determining whether an agency's action exceeded its statutory authority.[164] Under this framework, courts were required to first exhaust the traditional tools of statutory construction to determine whether "Congress has directly spoken to the precise question at issue;" if it has, the court's inquiry ended and the court had to "give effect to the unambiguously expressed intent of Congress."[165] If the statute was silent or ambiguous as to the legality of the agency's action, a court would proceed to step two of the *Chevron* framework and determine whether the agency's interpretation of the statute "is based on a permissible construction of the statute."[166] "If a statute is ambiguous, and if the implementing

---

[162] 5 U.S.C. § 706(2); *Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015).
[163] ___U.S.___, 144 S. Ct. 2244, 2261–63 (2024)
[164] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984); *Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 433–34 (5th Cir. 2021).
[165] *Chevron*, 467 U.S. at 842–43.
[166] *Alenco*, 201 F.3d at 619 (quoting *Chevron*, 467 U.S. at 843).

agency's construction [of the statute] is reasonable," a court would generally defer to the agency's interpretation of the statute.[167]

The Supreme Court overruled *Chevron* in *Loper Bright Enter*.[168] Now, when an agency's interpretation of statute is challenged, the agency is not entitled to deference even when a statute is ambiguous.[169] Rather, the APA requires courts to "exercise independent judgment in determining the meaning of statutory provisions."[170] Courts may consider an agency's interpretation as "a body of experience and informed judgment to which courts and litigants may properly resort for guidance,"[171] especially when the interpretation "rests on factual premises within the agency's expertise."[172] But an agency's interpretation of a statute cannot supplant the role of the judiciary as the final arbiter of a statute's meaning.[173] Courts might also consider "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," when determining the statute's meaning.[174]

Statutes may authorize an agency to exercise discretion, and that discretion could take many forms—including the authority to define a statutory term that Congress chose not to elucidate,[175] the authority to "fill up the details" of a statutory scheme,[176] or merely the authority to regulate within the clear limits of statute in a manner that is "appropriate" or "reasonable.[177] When statute delegates authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to

---

[167] *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 730 (5th Cir. 2018).
[168] *Loper Bright Enter.*, 144 S. Ct. at 2261–63.
[169] *Id.*
[170] *Id.*
[171] *Id.* at 2259.
[172] *Id.* at 2267 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n. 8 (1983)).
[173] *Id.*
[174] *Id.* at 2262.
[175] *Id.* at 2263 (citing *Batterton v. Francis*, 432 U.S. 416, 425 (1977))
[176] *Id.* (quoting *Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed. 253 (1825)).
[177] *Id.*

constitutional limits" by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decision-making within those boundaries."[178]

This change in the applicable standard impacts the present case because Plaintiffs' challenge to the statutory basis for the DOL's Final Rule turns on the meaning and application of the term "similarly employed" in 8 U.S.C. § 1188(a)(1)(B). Defendants' briefing on the issue relies heavily on *Chevron* to argue that the Court should defer to the DOL's interpretation of the statute and that the Final Rule is grounded on a permissible construction of the statute. Moreover, two district courts that rejected similar challenges to the Final Rule—*USA Farm Labor, Inc., et al. v. Su, et al.*[179] and *Florida Growers Ass'n, Inc., et al. v. Su, et al.*[180]—based their decisions, in part, on *Chevron* and deferred to the DOL's interpretation of the statute. In light of *Loper Bright Enter.*, however, *Chevron*'s rule of deference is no longer applicable.  Accordingly, following *Loper Bright Enter.*, the Court must turn to the task of "exercising independent judgment in determining the meaning of" section 1188(a)(1)(B), and whether the Final Rule is consistent with that meaning.

### b. Does Section 1188(a)(1)(B) Limit the DOL to the Occupations in the Farm Labor Survey (FLS) in Determining the AEWR?

Plaintiffs first argue that section 1188(a)(1)(B) limits the DOL to the agricultural occupations covered by the FLS in determining the AEWR for H-2A workers. Section 1188(a)(1)(B) requires the DOL to certify that "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States ***similarly employed***" as a condition for approval of an H-2A application. [181] The statute does not

---

[178] *Id.* (internal quotations, citations, and brackets omitted).
[179] 694 F. Supp. 3d 693 (W.D. N.C. 2023).
[180] 23-CV-889, 2024 WL 1343021 (M.D. Fla. March 29, 2024).
[181] 8 U.S.C. § 1188(a)(1)(B) (emphasis added).

direct the DOL how to determine whether the employment of an H-2A worker will "adversely affect" the wages and working conditions of domestic workers. Nor does the statute define the term "similarly employed." As a result, Courts have held that the statute grants discretion to the DOL to implement a regulatory regime to address that question.[182] As previously explained, the DOL exercised its discretion by implementing regulations adopting the AEWR and requiring employers to pay H-2A workers the AEWR rate in order to prevent downward pressure on the wage rates of domestic workers similarly employed. The DOL's AEWR methodology has changed over the years but the statutory authority for the methodology remains grounded on section 1188(a)(1)(B).[183]  If the DOL adopts an AEWR methodology that exceeds the boundaries set by the statute, the agency's action is unlawful.

Plaintiffs contend that workers employed in agricultural settings and non-agricultural setting are not "similarly employed" within the meaning of section 1188(a)(1)(B). When interpreting statutory language, "statutory terms are generally interpreted in accordance with their ordinary meaning."[184] The Court must "interpret the words consistent with their ordinary meaning ... at the time Congress enacted the statute."[185] However, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[186] The Court must not hold to the ordinary meaning of statutory terms if the context "suggests some other meaning."[187] Statutory provisions "should be interpreted harmoniously" when they are given "*in pari materia* ('in a like matter')."[188]

---

[182] *See, Overdevest*, 2 F.4th at 980.
[183] Opposition to Application, ECF No. 21 at 20.
[184] *Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1110.
[185] *Id.*
[186] *Id.* at 1111.
[187] *Id.* at 1110.
[188] *Id.* at 1110 (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 6, at 69 (2012)).

As noted above, the statute does not define the term "similarly employed." The word "similarly" as used in the statute can be fairly read to mean "having characteristics in common," "very much alike," or "alike in substance or essentials."[189] Accordingly, the statute does not require that workers be employed in identical or the same jobs. However, the term "similar" has to be read in the context of the statute and its purpose. The purpose of section 1188(a)(1)(B) is to ensure that the employment of H-2A workers does not adversely affect the wages or working conditions of domestic workers who are similarly employed.[190] Accordingly, an H-2A job must have sufficient common characteristics with a non-H-2A job that the wages and working conditions of one job impact the wages and working conditions of the other. Putting it another way, if the nature of the work, qualifications, and experience required for jobs performed by two groups of workers are sufficiently different, the wages and working conditions of one group of workers is not likely to adversely affect the wages and working conditions of the other group of workers.[191]

As noted above, before a putative H-2A employer can import a nonresident employee, section 1188(a)(1) requires them to apply to the DOL for a certification that there are insufficient domestic employees for the work and that the importation will not have adverse effects on similarly employed domestic employees. Under section 1188(c)(3)(A)(ii), the Secretary of Labor must provide that certification if, in part, the putative employer has not procured qualified eligible domestic workers (or referrals thereof) who are available to perform the employer's services "on the terms and conditions of a job offer which meets the requirements of the Secretary." The statute clarifies that, in determining whether "a specific qualification is appropriate in a job offer, the Secretary shall apply the normal and accepted qualifications required by non-H-2A-employers in

---

[189] "Similar," *Webster's Third New International Dictionary* 2120 (1986).
[190] 88 Fed. Reg. 12760, 12761 (Feb. 28, 2023) (discussing the purpose of the statute to prevent adverse effects to the wages and working conditions of domestic workers).
[191] ECF 3-10 at 16, 18-19, 25-27 (Declaration of Dr. Stephen Bronars, Plaintiffs' expert in labor economics).

the same or comparable occupations and crops."[192] In other words, before the DOL may certify that no domestic workers are qualified and available to perform an employer's labor, statute requires the DOL to examine any job offers that an employer has made to domestic workers. Those job offers must require domestic workers to have qualifications that comport with "the normal and accepted qualifications required" by employers who hire domestic laborers to work "in the same or comparable occupations and crops."

Because "the same or comparable occupations and crops" standard governs the DOL's review of the qualifications required by domestic job offers under section 1188(c)(3)(A)(ii), Plaintiffs argue that the term "similarly employed" in section 1188(a)(1)(B) must be given the same meaning.[193] In other words, Plaintiffs assert that the only domestic workers who are "similarly employed" to H-2A workers are those who perform "the same or comparable *occupations*" working with "the same or comparable *crops*." For example, a truck driver hauling sugarcane is not "similarly employed" to a truck driver hauling crawfish because they do not haul the same crop.[194] Plaintiffs assert that, in light of the statute's plain meaning, "the only reasonable construction of the statutory scheme is that a domestic worker is considered 'similarly employed' if his or her work involves 'the same or comparable occupations and crops' as H-2A laborers working for the same employer."[195]

The Court disagrees. Plaintiffs' reading of the statute gives the "similarly employed" language in section 1188(a)(1)(B) too narrow of a construction by limiting its application to employment involving the same crops. The provisions cited by Plaintiffs serve different purposes. section 1188(c)(3)(A)(ii) addresses whether there are sufficient domestic agricultural workers

---

[192] 8 U.S.C. § 1188(c)(3)(A)(ii).
[193] ECF No. 3-1 at 21.
[194] *Id.*
[195] *Id.* Plaintiffs do not address the addition of "working for the same employer."

available to the employer and, accordingly, whether hiring an H-2A worker would displace a domestic worker. On the other hand, section 1188(a)(1)(B) addresses the broader question of the impact of hiring H-2A workers on the wages and working conditions of domestic workers who are *similarly* employed. The text of section 1188(a)(1)(B) does not limit the DOL's "adverse wage effect" determination to workers employed to farm the "same crop."

In sum, the statute does not dictate the methodology that the DOL must use to determine the AEWR or otherwise limit the DOL to using a particular survey, such as the FLS. The only statutory constraints are the boundaries set by section 1188(a)(1)(B). Considering the record as a whole, the Court cannot conclude that the DOL's use of non-farm wage surveys, such as the OEWS, to supplement data from the FLS in setting the AEWR for H-2A workers exceeds the DOL's statutory authority as long as its methodology is based on workers who are "similarly employed." Simply put, Plaintiffs have not shown that agricultural and non-agricultural employees can *never* be "similarly employed" such that the DOL is limited to only using the FLS wage survey.

### c. Does the Final Rule's Application to H-2A Sugarcane Truck Drivers Violate Section 1188(a)(1)(B)?

Plaintiffs' more focused argument with respect to the treatment of H-2A workers whose duties include driving sugarcane trucks presents a different question. Plaintiffs argue that the DOL's use of average wage rates for non-farm heavy and tractor–trailer truck drivers to calculate the AEWR for H-2A workers who drive sugarcane trucks violates the statute because these two classes of workers are not "similarly employed."  Plaintiffs argue that H-2A workers who drive sugarcane trucks only fall under the DOL's "Agricultural Equipment Operators" SOC code and, accordingly, the average wage rates reflected in the FLS for this category should be used to calculate the AEWR for sugarcane truck drivers. In that regard, Plaintiffs point to the DOL's narrative for the Agricultural Equipment Operators SOC code, which describes multiple tasks that

characterize the jobs that fall under that code, including "*[d]riv[ing] trucks to haul crops*, supplies, tools, or farmworkers."[196] Plaintiffs argue that this task description best describes the work of H-2A workers who drive sugarcane trucks. In contrast, under the Final Rule, the DOL bases the AEWR for H-2A workers who haul sugarcane using heavy or tractor–trailer trucks on the non-farm OEWS wage rate for jobs that fall under the DOL's SOC for "Heavy and Tractor–Trailer Truck Drivers."[197] The narrative for this SOC category states that it applies to workers who "drive a tractor–trailer combination or a truck with a capacity of at least 26,001 pounds gross vehicle weight…."[198] Plaintiffs argue that more than 70% of the jobs covered by this latter category are full-time, non-farm transportation jobs, including long-haul interstate trucking jobs, that differ from the jobs performed by H-2A sugarcane haulers in terms of the nature of the work, tasks, experience, duration, and qualifications.[199]

The evidence submitted by Plaintiffs to support their motion includes declarations from (1) an agricultural expert, Dr. Kenneth Gravois;[200] (2) an agricultural economist, Dr. Michael Deliberto;[201] and (3) a labor economist, Dr. Stephen Bronars.[202] Plaintiffs also submitted declarations from sugarcane growers and the General Manager of the ASCL, Jim Simon.[203] The record also includes the Federal Register entry outlining the DOL's consideration supporting the Final Rule, as well as the DOL's descriptions for its SOC code classifications relevant to the Final Rule's changes to the AEWR.[204] Plaintiffs contend that this evidence demonstrates the distinctions between the nature of the work, experience, and qualifications required for sugarcane haulers and

---

[196] ECF No. 3-10 at 40 (emphasis added).
[197] 88 Fed. Reg. 12760, 12780 (Feb. 28, 2023).
[198] ECF No. 3-10 at 42.
[199] *Id.* at 20.
[200] ECF No. 3-9.
[201] ECF No. 3-11.
[202] ECF No. 3-10.
[203] ECF Nos. 3-3, 3-5, 3-6, 3-7, 3-8.
[204] ECF Nos. 3-12, 3-16.

nonagricultural heavy and tractor-trailer truck drivers, and that these categories of workers are not "similarly employed" within the meaning of section 1188(a)(1)(B).

### 1. Dr. Gravois

Dr. Gravois served as a professor of sugarcane breeding and Resident Coordinator for LSU's Sugar Research Station.[205] He is currently a sugarcane specialist with the Sugar Research Station. Dr. Gravois states that he also "worked on the family [sugarcane] farm" and has "personal knowledge about the operations of a sugarcane farm."[206] Dr. Gravois opines that the workers on a sugarcane farm must "be able to multitask" and "perform various tasks essential to a successful harvest, including switching from operating harvesting equipment to hauling crops to the mill before returning to other tasks at the farm."[207] Accordingly, workers on a sugarcane farm "who have any hauling duties occasionally perform other duties" such as "maintaining and repairing equipment, driving others to job sites, picking up spilled sugarcane on the loading sites, etc."[208] He further explains that hauling sugarcane from field to mill occurs during the harvest season, which typically lasts three to four months from September through January.[209] With respect to H-2A workers who drive sugarcane trucks during the harvest season, Dr. Gravois explained that these workers transport sugarcane "short distances from local forms to local mills; they are not traveling large distances across the State of Louisiana or across state lines."[210] He also states that these workers "more often than not … perform other farm tasks before and after transporting the crops to the mill."[211] He explains that "the task of transporting sugarcane is a seasonal, temporary task arising out of a sugarcane harvest, which is unlike the year-round nature of long-haul truck

---

[205] ECF No. 3-9 at 2.
[206] *Id.*
[207] *Id.* at 3.
[208] *Id.* at 4.
[209] *Id.* at 3-4.
[210] *Id.* at 5.
[211] *Id.*

driving."[212]  He concludes that transporting sugarcane to the mill "is inherently agricultural work arising out of and incidental to the farming of sugarcane."[213]

### 2.  *Dr. Deliberto*

Dr. Deliberto is an associate professor in the Louisiana State University's Department of Agricultural Economics and Agribusiness.[214] He explains in his declaration that he was retained to analyze "the impact that an increase in the AEWR for in-field H-2A labor can have on a representative sugarcane farm and to the Louisiana sugarcane industry."[215] He states that, under the final rule, the AEWR for workers who at any time operate a heavy truck to haul sugarcane would increase from $13.67 to $25.67 an hour.[216] He estimates that this increase will result in approximately $46,938,022 in additional labor costs for the sugarcane industry.[217]

### 3.  *Dr. Bronars*

Dr. Bronars is the former Chair of the Economics Department at the University of Texas at Austin and is a labor economist.[218] He states in his declaration that the "purpose of the AEWR is to protect the wages and employment opportunities of domestic workers in similar work from the possible adverse effects of the H-2A visa program."[219] He explains that the economic rationale for the DOL's use of the AEWR was to ensure that an influx of H-2A workers would not "depress the wages of domestic farmworkers absent a prevailing wage equal to an area's main farm worker rate wage."[220] He further states that the Final Rule requires that H-2A wage rates be based on non-farm occupational "OEWS data for positions that require *any* tasks in activities associated with

---

[212] *Id.*
[213] *Id.*
[214] ECF No. 3-11 at 4-6.
[215] *Id.* at 1.
[216] *Id.* at 96.
[217] *Id.*
[218] ECF No. 3-10 at 4.
[219] *Id.* at 14.
[220] *Id.*

occupations other than the six FLS occupations."[221] He opines that the DOL has not explained how H-2A workers who are assigned tasks not reflected in one of the six FLS occupations, such as driving heavy or tractor-trailer trucks to haul sugarcane, could plausibly impact the wages of domestic workers in "the much larger non-farm sector where most jobs are in metropolitan areas."[222] According to Dr. Bronars:

> The conjecture that a lower H-2A prevailing wage would depress the wages of domestic farm workers is doubtful because domestic farm workers can move (and have moved) to the non-farm sector which is much larger than the farm sector. In spring 2022 there were 630,000 hired farm workers in the U.S. including 112,000 in jobs that were expected to last fewer than 150 days (FLS), while there were 147.9 million employees of non-farm establishments (OEWS). … Even an influx of H-2A visa workers that appears large relative to farm sector employment would be small relative to the non-farm workforce in the U.S.[223]

Dr. Bronars also notes that the impact of the Final Rule is more significant because any H-2A worker who hauls sugarcane using a heavy truck would qualify for the higher AEWR wage rate, which in turn is based on the wage rates of full-time, year-round non-farm truck drivers. These H-2A workers receive this higher wage rate regardless of the number of hours the H-2A workers actually devote to hauling sugarcane versus other harvest-related duties.[224] Dr. Bronars opines:

> The Rule requires H-2A prevailing wage determinations (PWDs) to be based on OEWS data for positions that require any tasks and activities associated with occupations other than the six FLS occupations. The Rule makes no economic sense because any influx of H-2A workers engaged in other tasks are dwarfed by the magnitude of the non-farm sector in the U.S. The DOL does not explain how the hiring of seasonal H-2A farm workers who complete any tasks different from those associated with "combined field and livestock" jobs, could plausibly impact the wages of domestic wages in the much larger non-farm sector where most jobs are in metropolitan areas.[225]

---

[221] *Id.* at 15-16.
[222] *Id.* at 16.
[223] *Id.*
[224] *Id.* at 17-18.
[225] *Id.* at 16.

Dr. Bronars further opines that the Final Rule "ignores the skills, qualifications, and experience differences among different types of truck drivers and instead groups sugarcane truck drivers in the heavy and tractor-trailer truck driver occupation."[226] He states that approximately "70% of drivers in the heavy and tractor- trailer truck driver occupation are employed in a handful of the non-farm industries: Truck Transportation, Merchant Wholesalers (both durable and non-durable goods), Warehousing and Storage, Nonmetallic Mineral Product Manufacturing, and Couriers and Messengers."[227] He explains that workers employed in these industries have "substantially different training and experience than sugarcane truck drivers."[228] He further states that the DOL appears to justify relying on the non-farm "heavy and tractor-trailer truck driver" SOC code based on "the equipment being used rather than the skills and experiences of the workers hired."[229]

Finally, Dr. Bronars notes that the DOL's own description of the types of jobs that fall within the non-farm heavy truck and tractor-trailer truck driver SOC code states that the jobs require commercial driver's licenses.[230] According to Dr. Bronars, "sugar cane truck drivers are not required to have a commercial drivers' license and transport harvested sugar cane over relatively short distances."[231] In contrast, most of the jobs covered by this SOC code "generally require driving over long distances over major highways."[232]

### 4.  *Sugarcane Growers and the American Sugar Cane League*

The declarations of the ASCL and Louisiana sugar cane growers generally describe the unique characteristics of the work and tasks performed by H-2A workers on Louisiana sugar cane

---

[226] *Id.* at 20.
[227] *Id.* at 20-21.
[228] *Id.* at 21.
[229] *Id.* at 20.
[230] *Id.* at 19-20.
[231] *Id.* at 20.
[232] *Id.*

farms.[233] For example, Jim Simon, General Manager of the ASCL, provides a general overview of the harvesting process:

> Sugarcane harvest starts in September with harvesters of moving through the fields row by row to cut the tall stalks into smaller pieces that are conveyed and dumped into a wagon being pulled by a tractor along the side of the harvester. When the wagon is full, the tractor then pulls the filled wagon to a truck and the load is dumped into a truck's trailer. The truck loaded with the freshly harvested cane immediately drives a short distance to the mill for processing. This process is repeated until all of the 475,000 acres of sugarcane in Louisiana are harvested and milled.[234]

Simon further explains in his declaration that workers who drive the sugarcane trucks are seasonal, performing harvest-related tasks over the three to four month harvest season.[235] He states that the increase in wage rates for those who haul sugarcane would result in increased labor costs of approximately $21,675,000 to the Louisiana sugarcane industry.[236] The declarations submitted from sugarcane growers also indicate that, because of the nature of sugarcane harvesting activities, workers "typically live together in communal housing with employees who do not complete harvesting and hauling work."[237]

* * *

Considering the record as a whole, the Court concludes that Plaintiffs have shown a substantial likelihood of success on their claim that the Final Rule exceeds the DOL's statutory authority as it pertains to the Highest AEWR Rule for H-2A workers who haul sugarcane using heavy or tractor-trailer trucks. While section 1188(a)(1)(B) does not require that the DOL base the AEWR on average wage rates for jobs or occupations that are the same or identical, the statute requires that the jobs be sufficiently comparable that the wage rates and working conditions of the

---

[233] ECF Nos. 3-3, 3-5, 3-6, 3-7, and 3-8.
[234] ECF No. 3-3 at 3.
[235] *Id.*
[236] *Id.* at 4.
[237] ECF No. 3-8 at 5.

H-2A job at issue can adversely impact the wage rates and working conditions of domestic workers employed in the non-H-2A job. Otherwise, the AEWR would have no correlation to whether the employment of an H-2A worker adversely impacts similarly employed domestic workers. Absent this correlation, the AEWR methodology set forth in the Final Rule exceeds the scope of section 1188(a).

The DOL's explanation for how occupations are categorized in its SOC codes provides some guidance for comparing jobs that fall under each category. According to the DOL, "occupations are classified based upon work performed, skills, education, training, and credentials" for purposes of the SOC codes.[238] Here, the record reflects that, while H-2A sugarcane truck drivers use equipment similar to non-farm heavy and tractor-trailer truck drivers and both use public roads, there are significant, material differences between the "work performed, skills, education, training, and credentials" between the jobs performed by these two categories of workers. Specifically, the evidence in the record (which is summarized above) shows:

- **Employment duration**: H-2A workers who drive sugarcane trucks during harvest season 3-4 months out of the year—in contrast, many non-farm heavy and tractor-trailer truck drivers work year-round full time;

- **Work Environment:** H-2A sugarcane haulers drive relatively short distances back and forth between the field and the mill—in contrast, the "Heavy and Tractor-Trailer Truck Driver" SOC code includes interstate truck drivers who drive long distances as well as messengers and couriers who may operate in densely populated urban areas;

  - H-2A sugarcane truck drivers also often live in communal settings on the farm, and there is no evidence in the record that these working conditions are comparable to the working conditions of non-farm truck drivers (or that the DOL considered this difference);

- **Nature of Tasks Performed**: H-2A sugarcane haulers may perform other harvest-related tasks when not driving—in contrast, the DOL's own task descriptions for

---

[238] SOC User Guide, https://www.bls.gov/soc/socguide.htm (last viewed, August 12, 2024).

the "Heavy and Tractor-Trailer Truck Driver" SOC code does not list farm-related tasks;

- **Credential Requirements:** The record does not reflect any credential or training requirements for H-2A sugarcane haulers, who are exempt from CDL requirements—in contrast, long-haul interstate truck drivers are subject to CDL requirements as well as federal regulations on training.

Given these differences, Plaintiffs' economics expert opines that there is no evidence that the wages and working conditions of H-2A sugarcane truck drivers would have an adverse effect on the wages and working conditions of the broader and more diverse group of domestic workers who fall within the non-farm SOC code for heavy and tractor-trailer truck drivers.[239] Moreover, the differences between the two groups—H-2A sugarcane truck drivers and non-farm heavy and tractor-trailer truck drivers—are magnified by the DOL's approach of applying this higher AEWR to H-2A workers who spend *any* time during the harvest season hauling sugar cane, even if the hours spent on those tasks are only a portion of the total hours spent performing other harvest-related tasks.

The record does not reflect that the DOL considered the extent to which the wages and working conditions of H-2A sugarcane truck drivers affected the wages and working conditions of the much broader group of domestic, non-farm transportation workers. In response to comments addressing the effect of the Final Rule on agricultural truck drivers, the DOL merely responds that "the Department views operating semi-trucks hauling commodities over public roads to generally involve the same or similar skills, qualifications, and tasks, whether the commodity is agricultural or nonagricultural in nature."[240] However, the DOL offers no explanation or analysis with respect to the significant differences in the "work performed, skills, education, training, and credentials" of H-2A workers who drive sugarcane trucks and the non-agricultural workers who fall under the

---

[239] ECF 3-10 at 16, 18-19, 25-27.
[240] 88 Fed. Reg. 12760, 12782 (Feb. 28, 2023).

Heavy and Tractor-trailer Truck Driver SOC code. For example, the DOL discounts the fact that H-2A haulers may be exempt from CDL requirements: "an H-2A job opportunity requiring a worker to operate semi-trucks with at least 26,001 pounds gross vehicle weight, *whether a commercial driver's license is required or not*, over public roads… would likely result in the [DOL] assigning SOC code 53-3032 (Heavy and Tractor – Trailer Truck Drivers)" as far as the AEWR.[241] Yet, the DOL does not address the fact that an H-2A worker with no CDL is qualified to haul sugarcane during the harvest season but would not be qualified to perform other transportation jobs falling under the non-farm Heavy and Tractor-trailer Truck Driver SOC code. In the end, the DOL appears to ground its new AEWR methodology—at least as it applies to sugarcane truck drivers—solely on the type of equipment used by these workers without considering the broader question of whether the wages and working conditions of one group will have any impact on the wages and working conditions of the other group, which is what section 1188 requires.

 The DOL also relies heavily on SOC codes in justifying an increase in the AEWR applicable to sugar cane haulers, yet ignores its own guidance in how workers are categorized under its own SOC codes. Specifically, the DOL's SOC code for "Agricultural Equipment Operators" specifically refers to the tasks performed by H-2A workers who use trucks to haul sugarcane from the field to the mill: "Drive trucks to haul crops, supplies, tools, or farm workers."[242] In contrast, the SOC code that the DOL contends best applies to these H-2A workers—the SOC code for "Heavy and Tractor-trailer Truck Drivers"—lists no farm-related tasks similar to the tasks performed by H-2A workers.[243] Indeed, the DOL's description for the non-farm "Heavy and Tractor-trailer Truck Driver" SOC code includes an annotation for "related

---

[241] *Id.* (emphasis added).
[242] ECF No. 3-10 at 40.
[243] *Id.* at 42.

occupations" but lists no farm-related occupations or tasks similar to those performed by H-2A workers who haul sugarcane.[244]

The district court decisions in *USA Farm Labor, Inc.*.[245] and *Florida Growers Ass'n, Inc*[246] do not support the DOL's position in the present case. In both cases, the courts rejected claims that the Final Rule exceeded the DOL's authority under section 1188(a)(1)(B). However, both courts relied on *Chevron* and deferred to the DOL's broad reading of section 1188(a)(1)(B). After *Loper Bright Enter.*, this deferential standard of review is no longer applicable. Moreover, neither court addressed the significant differences between H-2A sugarcane haulers and non-farm heavy and tractor-trailer truck drivers, or the extent to which the wage rates and working conditions of the former have any effect on the latter.

In sum, Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that the Final Rule exceeds the DOL's authority under section 1188(a)(1)(B) because it bases its revised AEWR methodology for H-2A sugarcane truck drivers on the average wages of domestic, non-farm transportation workers who are not similarly employed.

### 2. Is the Final Rule Arbitrary and Capricious?

Plaintiffs alternatively argue that, even if the DOL had statutory authority for the Final Rule, the Final Rule is arbitrary and capricious, in violation of section 706(2)(A) of the APA, because (1) the DOL failed to sufficiently explain its shift in long-standing policy or practice, and (2) regardless of any explanation, the Final Rule's treatment of agricultural heavy truck drivers is unreasonable.[247] The Court's conclusion with respect to the statutory authority satisfies the

---

[244] ECF No. 30-10 at 42.
[245] 694 F. Supp. 3d 693.
[246] 23-CV-889, 2024 WL 1343021.
[247] ECF No. 3-1 at 23-24.

"likelihood of success" requirement for injunctive relief. However, the Court will also address Plaintiffs' argument under the "arbitrary and capricious" standard.

Under the APA, courts must set aside "agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[248] Agency action does not violate this standard so long as it is "reasonable and reasonably explained," in other words, so long as the agency "has acted within a zone of reasonableness and, in particular, that the agency has reasonably considered the relevant issues and reasonably explained the decision."[249] To act reasonably, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[250] Reasoning that "fails to account for relevant factors or evinces a clear error of judgment" must be set aside.[251] In general, an agency action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[252]

The reasoning on which an action was based must be articulated by the agency at the time the decision was made, and not developed after the fact.[253] The reasoning need not be perfectly clear, but it is sufficient so long as "the agency's path may reasonably be discerned."[254]

---

[248] 5 U.S.C. § 706(2)(A).
[249] *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th Cir. 2023) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S. Ct. 1150, 1158, 209 L.Ed.2d 287 (2021)).
[250] *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))(internal quotations omitted).
[251] *Id.* (quoting *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021))(internal quotations omitted).
[252] *Id.* (quoting *State Farm*, 463 U.S.at 43).
[253] *Id.* (quoting *Texas v. United States*, 40 F.4th 205, 226-27 (5th Cir. 2022)).
[254] *Id.* (quoting *State Farm*, 463 U.S. at 43).

Here, for the reasons discussed above, the DOL has failed to consider or "reasonably explain" the basis for its decision to calculate the AEWR for H-2A workers who drive sugarcane trucks based on the higher average wage rates for non-farm heavy and tractor-trailer truck drivers. As explained above, the record does not reflect any attempt by the DOL to analyze the differences in the "work performed, skills, education, training, and credentials" of these two groups of workers. Nor does the record reflect that the DOL analyzed or even considered whether the wages and working conditions of H-2A workers has any effect on the broader, more diverse pool of non-farm heavy and tractor-trailer truck drivers. Instead, the DOL appears to focus entirely on the type of equipment used by the two groups of workers. Finally, the DOL appears to ignore its own guidance with respect to the SOC codes on which it bases the Final Rule. Specifically, the tasks performed by H-2A sugarcane truck drivers matches the SOC description for agricultural equipment operators—"Drive trucks to haul crops ...."[255] As explained above, the SOC code on which the DOL bases its revised AEWR for this group of workers—Heavy and Tractor-trailer Truck Drivers—lists no farm or agricultural related tasks.

In sum, the Court concludes that Plaintiffs have demonstrated a substantial likelihood of success on their claim that the Final Rule is arbitrary and capricious because the record reflects that the DOL failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[256] In light of the above, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their challenge to the Final Rule under the APA.

---

[255] ECF No. 3-10 at 40.
[256] *BNSF Ry. Co.*, 62 F.4th at 910.

### 3.   Does the Final Rule Violate the Regulatory Flexibility Act?

Plaintiffs alternatively seek an injunction on the grounds that the Final Rule violates the RFA because (1) the Rule's section 605 certification was not made by the Secretary of Labor, and (2) the DOL's analysis underestimated the Final Rule's economic impact on small entities.[257] Defendants counter that the proper DOL official made the certification, and that the DOL's economic analysis was sufficient.[258]

As noted above, under section 604 of the RFA, when an agency promulgates a rule which requires notice and a period of comment, it generally must issue initial and final regulatory flexibility analyses.[259] However, under section 605(b), agencies do not need to issue regulatory flexibility analyses if "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." That certification must be published at the time of the final rule, "along with a statement providing the factual basis for such certification." Compliance with sections 604 and 605(b) are subject to judicial review.[260] However, that review is only to determine "whether an agency has made a reasonable, good-faith effort to carry out the mandate of the RFA."[261] The RFA imposes procedural, not substantial, requirements,[262] and judicial review is "'highly deferential' as to the substance of the analysis, particularly where an agency is predicting the likely economic effects of a rule."[263]

Here, the Final Rule includes a certification that "the final rule does not have a significant economic impact on a substantial number of small entities," along with an analysis purporting to

---

[257] ECF No. 3-1 at 27.
[258] ECF No. 21 at 26-29.
[259] 5 U.S.C. §§ 603, 604.
[260] 5 U.S.C. § 611(a)(1). There is no dispute that Plaintiffs constitute small entities under the RFA.
[261] *Alenco*, 201 F.3d at 625 (quoting *Associated Fisheries, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir.1997)).
[262] *Id.*
[263] *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015)(quoting *Helicopter Ass'n Int'l, Inc. v. F.A.A.*, 722 F.3d 430, 438 (D.C. Cir. 2013)).

support that conclusion.[264] Plaintiffs challenge this certification. Given the Court's conclusion with respect to Plaintiffs' APA claims, the Court need not consider Plaintiffs' RFA claim as an additional ground to support injunctive relief.

### C. Irreparable Harm.

Plaintiffs assert they will suffer irreparable harm absent injunctive relief because the increased wages required by the Highest AEWR Rule constitute "nonrecoverable costs of complying with a putatively invalid regulation."[265] Defendants argue that there is no threat of irreparable harm because increased wages are a purely economic injury, the claimed costs are *de minimis,* and any increased wages are "self-inflicted" because they will only result if Plaintiffs choose to employ workers in tasks that are associated with a higher AEWR.[266] Furthermore, Defendants argue that Plaintiffs' delay in commencing this action and applying for injunctive relief show a lack of urgency, contrary to Plaintiffs' claims.[267] Plaintiffs assert that they waited to seek injunctive relief in order to avoid duplicative lawsuits.[268]

Irreparable harm exists "where there is no adequate remedy at law."[269] That harm must be more than "speculative ... there must be more than an unfounded fear on the part of the applicant."[270] Generally, compensable monetary damages do not constitute irreparable harm.[271]

---

[264] Final Rule, 88 FR at 12799.
[265] ECF No. 3-1 at 29 (quoting *Restaurant Law Center v. United States Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023)).
[266] ECF No. 21 at 29-31.
[267] ECF No. 21 at 29.
[268] ECF No. 3-1 at 29-30.
[269] *Mock v. Garland*, 697 F. Supp. 3d 564, 577 (N.D. Tex. 2023)(quoting *Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022)).
[270] *Louisiana v. Biden*, 55 F.4th at 1033–34 (citing *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016)).
[271] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011)(citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir.1975)).

However, costs incurred in "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."[272]

Plaintiffs allege that, absent an injunction, they will suffer irreparable harm in the form of increased labor costs resulting from the Final Rule's adjustment of the AEWR for sugarcane truck drivers. Mr. Simon states in his declaration that the cost of complying with the Final Rule will exceed $21,675,000.[273] Plaintiffs' agri-business expert, Dr. Deliberto, opines that the Final Rule will result in increased labor costs for the Louisiana sugarcane industry of up to $46,938,022.[274] These cost-of-compliance projections are not *de minimis*. These projections reflect wage increases that flow directly from the implementation of the Final Rule because, absent the Final Rule and resulting increase in the AEWR, sugarcane growers would pay sugarcane haulers a lower AEWR. Moreover, even if farmers' increased labor costs are characterized as a "purely economic injury," purely economic costs may qualify as irreparable harm "where they cannot be recovered 'in the ordinary course of litigation.'"[275] Here, there are no grounds for Plaintiffs to re-coup these compliance costs in the ordinary course of litigation. Accordingly, the Court concludes that Plaintiffs have satisfied the irreparable harm requirement for injunctive relief.

### D.  **Balance of Harms and Public Interest.**

The Court further concludes that the "balance of harms" and the "public interest" weigh in favor of injunctive relief. The Fifth Circuit has held that "'[t]here is generally no public interest in the perpetuation of unlawful agency action.'"[276] With respect to the balance of harms, the record reflects that the Final Rule imposes significant costs on the Louisiana sugarcane industry. Even if

---

[272] *Texas v. EPA,* 829 F.3d 405, 434 & n.41 (5th Cir. 2016).
[273] ECF No. 3-3 at 4.
[274] ECF No. 3-11 at 96.
[275] *Texas v. EPA*, 829 F.3d at 434 & n.41.
[276] *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

those costs could be passed on in the form of higher prices, consumers would be harmed. In contrast, the record does not reflect any corresponding costs to the DOL to an order enjoining an unlawful agency action. Enjoining the Final Rule will impact the wages of H-2A workers who drive sugarcane trucks. But, in the case of these workers, the increase in wages was the result of a change in the AEWR that violates section 1188(a)(1)(B). If the Final Rule is enjoined, their wages will revert to the DOL's pre-Final Rule AEWR methodology, which courts have held was consistent with the statute.

### E.  **Plaintiffs Are Entitled to Injunctive Relief.**

In sum, the Court concludes that Plaintiffs have satisfied all of the requirements for injunctive relief and, therefore, GRANTS Plaintiffs' Application for Preliminary Injunction. The DOL is enjoined from enforcing the Final Rule in the following respects:

(1) the preliminary injunction is limited to H-2A workers employed in sugarcane farming and processing operations in the State of Louisiana; and

(2) the preliminary injunction applies only to H-2A workers hired by the named Plaintiffs and the members of the Teche Vermilion Sugar Cane Growers' Association, Inc., the Cora Texas Growers & Harvesters Agricultural Association, Inc., and the American Sugar Cane League, who grow, harvest, and process sugarcane in Louisiana.

Rule 65(c) provides that "[t]he court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of security required "is a matter for the discretion of the trial court," and the Fifth Circuit has held district courts have discretion to "require no security at all."[277] The Court finds no evidence that the DOL will suffer

---

[277] *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citing *Corrigan Dispatch Company v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

any financial loss resulting from the Court's order enjoining enforcement of the Final Rule in the manner set forth above. Accordingly, the Court determines that no security is required under Rule 65(c).

**V.**

**CONCLUSION**

In light of the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Plaintiffs' Application for a Preliminary Injunction [ECF No. 3] is GRANTED. The Department of Labor is enjoined from enforcing the Final Rule in the following respects:

(1) the preliminary injunction is limited to H-2A workers employed in sugar cane farming and processing operations in the State of Louisiana; and

(2) the preliminary injunction applies only to H-2A workers hired by the named Plaintiffs and the members of the Teche Vermilion Sugar Cane Growers' Association, Inc., the Cora Texas Growers & Harvesters Agricultural Association, Inc., and the American Sugar Cane League, who grow, harvest, and process sugar cane in Louisiana.

Plaintiffs and their members need not provide any security for this injunction.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendants' Partial Motion to Dismiss [ECF No. 32] and Defendants' Motion to Dismiss the Amended Complaint [ECF No. 37] are GRANTED IN PART and DENIED IN PART, as follows:

Defendants' motion to dismiss certain Plaintiffs for lack of standing is DENIED.

Defendants' motion to dismiss Plaintiffs' claims under the Congressional Review Act is GRANTED, and those claims are DISMISSED.

Defendants' motion to dismiss Plaintiffs' Regulatory Flexibility Act claims based on the allegation that the "head of the agency" did not make the section 605(b) certification is GRANTED, and those claims are DISMISSED.

Defendants' motion to dismiss Plaintiffs' Regulatory Flexibility Act claims based on the allegation that the section 605(b) certification's economic analysis was inadequate is DENIED.

**THUS DONE AND SIGNED** in Chambers, this 18th day of September, 2024.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**